UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Tyran Pinkins

-Plaintiff

vs.

Case No:

Violations of the 4th and 14th Amendments of the U.S. Constitution, by 42 U.S.C. § 1983, and under the Americans With Disabilities Act, 42 U.S.C.12101

City of Racine                           and
Racine Police Officer Joshua Diedrich    and
Unknown Racine Police Officers 1-5

-Defendant(s)

## Complaint

NOW COMES Tyran Pinkins, by his attorneys Strouse Law Offices and Napierala Law Offices and bring the following claims on his behalf under the 4th and 14th Amendments by 42. U.S.C 1983 as follows: 1) *Monell Claim* against the City of Racine; 2) Excessive Use of Force against Racine Police Officer Joshua Diedrich; 3) Excessive Use of Force against Unknown Racine Police Officers 1-5, and then for Injunctive Relief under the Americans with Disabilities Act.

## PARTIES

1. That Plaintiff Tyran Pinkins ("Plaintiff") is a welder by trade and is a real person and resident of the State of Wisconsin domiciled at 521 Sixth St. Racine WI 53403.

2. That at all times material hereto Plaintiff was a diabetic whose condition made him susceptible to diabetic seizures.

3. That Plaintiff, a diabetic, is a person with a disability as defined under the Americans With Disabilities Act ("ADA"). The ADA defines "disability" with respect to an individual as, "a physical or mental impairment that *substantially limits* one or more major life activities of such individual; a record of such impairment; or being regarded as having such an impairment" 42 U.S.C. 12102(1)(A)-(C).

29 C.F.R. 16320.2(j)(1)(i) elaborates on what **substantial impairment** under the ADA means:

"The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. The ADA defines "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," as well as "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, **endocrine**, and reproductive functions." 42 U.S.C. 12102(2)(A)-(B) See Also 29 C.F.R. 1630.2(i)(1)(i)-(II).

**Diabetes affects the operation of the pancreas and also the function of the endocrine system.**

"Major life activities" encompasses the functioning of the endocrine system. The regulations also provide that the operation of a major bodily function may include the operation of an individual organ within a body system. This would include, for example, the operation of the kidney, liver, pancreas, or other organs. . . . The link between particular impairments and various major bodily functions should not be difficult to identify. Because impairments, by definition, affect the functioning of body systems, they will generally affect major bodily functions. For example . . . **diabetes affects the operation of the pancreas and also the function of the endocrine system.** 76 Fed. Reg. 16978, 17007 (March 25th,

2011) and 29 C.F.R. pt. 1630.2(i) See Also Lawson v. CSX Transp. Inc., 245 F.3rd 916, 923 (7th Cir.).

4. That as a diabetic, Plaintiff is part of a protected class of persons who can avail himself of the protections and remedies available under the ADA.

5. That the City of Racine is a government entity with a principal address of 730 Washington Avenue, Racine WI 53403.

6. That Officer Racine Police Officer Joshua Diedrich is a real person who at all times material hereto was a police officer employed by the Racine Police Department.

7. That Racine Police Officers 1-5 are all real persons whose real names are unknown at the present, who at all times material hereto were police officers employed by the Racine Police Department.

## FACTS

More than 100 million U.S. adults are now living with diabetes or prediabetes, according to the Centers for Disease Control and Prevention (CDC). The report finds that as of 2015, 30.3 million Americans – 9.4 percent of the U.S. population – have diabetes.

It is critical to understand the science and medicine of diabetes in order to appropriately respond to claims that a person with diabetes is posing a safety threat to himself, the community, or to an officer. When police officers do take improper actions based on safety concerns, they almost always do so either out of ignorance of diabetes and its effects or because of improper or insufficient training in making the decision. Therefore, knowledge of the medicine and science of diabetes is critical in evaluating a police officer or a police department's action(s). More information about the disease can be found on the American Diabetes Association's web site at www.diabetes.org.

8. That Plaintiff readopts and re alleges Counts 1- 7 as though fully set out herein.

9. That a true and accurate copy of the Racine Police dash-cam video which captures most of the events of October 16th, 2016 is attached hereto as Exhibit 1 and incorporated by reference as "The Video".

10. That attached hereto as Exhibit 2 is a true and accurate copy of the Fox 6 News 3/3/2019 Investigative Report, by Investigative Reporter Amanda St. Hilaire ("Investigative Report").

11. That attached hereto as Exhibit 3 is a true and accurate copy of Racine County Case No 16 CF 1498 *Preliminary Hearing of Joshua Diedrich* before Court Commissioner Alice Rudebusch, See P. 5, "*Diedrich Trans*" and incorporated hereto by reference.

## The Events of October 16th 2016

12. That on October 6th, 2016 Officer Joshua Diedrich ("Officer Diedrich") was employed as a Racine Police Officer for the City of Racine.

13. That at approximately 6:54 p.m. on October 6th, 2016 and at all material times thereafter, Officer Diedrich was working in his capacity as a Racine Police Officer, in uniform and driving a marked squad car at or near the intersection of State Street and Lake Avenue, in the City of Racine (See The Video).

14. That then and there Officer Diedrich was flagged down by an unknown individual who was attempting to get emergency medical care for Plaintiff (Id.).

15. That the reason for the emergency was that Plaintiff was experiencing a severe seizure due to his diabetic condition.

16. That Officer Diedrich made an initial observation that the Plaintiff was experiencing a seizure and requested a rescue squad for him See P. 5, *Diedrich Trans p5*.

> Q: When you arrived and had approached Mr. Pinkins, what happened?
> A: He was on the ground shaking which I believe to be having a seizure. He had vomit on his face and on his clothing.
>
> (See Also The Video and Investigative Report)

4
Case 2:19-cv-00368-PP   Filed 03/12/19   Page 4 of 20   Document 1

17. That Officer Diedrich testified he was responding in his official capacity as a "community caretaker" and not there to arrest Plaintiff for suspicion of criminal activity. (Id. at 6).

18. That as of October 16th, 2016, Officer Diedrich had insufficient knowledge, training or experience to determine what medical condition the Plaintiff was then and there suffering from:

19. "I had no idea if he was having a medical emergency. It was an overdose, something like that..." *Diedrich Trans p6*.

    "Obviously this isn't normal" (Id. at 6).

20. It's not too surprising that Officer Diedrich had no idea that Plaintiff was having a medical emergency, because the City of Racine, by its own admissions, failed this officer and all other Racine Police Officers by not mandating system wide training on seizures for the police department and have no realistic plans on doing so so. *See Investigative Report*.

21. That had Officer Diedrich been equipped with proper department wide training by The City of Racine he could have recognized that the Plaintiff was in a highly disoriented state at that point because he was suffering from an acute diabetic seizure.

22. That as events unfolded thereafter Plaintiff began to get up and grip the street light pole *See The Video*.

23. That shortly thereafter Officer Diedrich attempted to get Plaintiff to sit down and await the emergency squad *See The Video*.

24. That soon thereafter matters deteriorated between Plaintiff and Officer Diedrich wherein:

    a. Plaintiff's disorientation from having an acute diabetic seizure intensified *See Taggart assessment in the Investigative Report;*
    b. Plaintiff started to wander into the street then;
    c. Plaintiff began to walk away from Officer Diedrich upon which Officer Diedrich grabbed Plaintiff;
    d. That due to his diabetic seizure, Plaintiff began to uncontrollably flail around;

    e. That as soon as Plaintiff began to uncontrollably flail around Officer Diedrich tackled the Plaintiff who landed on his back, with Officer Diedrich and continued to flail around in the midst of a acute diabetic seizure;

    f. That the effect of Officer Diedrich's tackling Plaintiff only intensified Plaintiff's uncontrollable flailing;

    g. That in reaction to Plaintiff's uncontrollable flailing, Officer Diedrich punched Plaintiff multiple times with a closed fist, causing Plaintiff multiple blows to the head which caused Plaintiff permanent injuries to permanent injuries to Plaintiff's eye(s), vision, jaw and dental as well as bodily harm.
*See The Video*

25. When Officer Diedrich caused multiple blows to the head of the Plaintiff with a closed fist he was, then and there, exercising deadly force.

26. That the deadly force exercised by Officer Diedrich was excessive and done with a reckless and/or callous disregard for the Plaintiff's rights.

27. That the deadly force exercised by Officer Diedrich was excessive and done with a reckless and/or callous disregard for the Plaintiff's rights, which under the Americans with Disabilities Act, are quite extensive.

28. That the Seventh Circuit has held that a blow to the head with a closed fist can constitute deadly force See <u>Sallenger v. Oakes</u>, 473 F3rd 731, 740 (7th Circuit, 2007).

29. That Officer Diedrich's use of deadly force was unreasonable under the circumstances and caused Plaintiff Plaintiff permanent injuries to Plaintiff's eye(s), vision, jaw and dental as well as bodily harm. *See Investigative Report Pictures(s).*

30. That (Retired) Epilepsy Foundation Heart of Wisconsin Executive Director, Art Taggart, an expert with thirty (30) years experience in dealing with seizures said after watching *The Video*:

Immediately the policeman recognized that it was probably a seizure happening…an appropriate response is not to escalate the situation, to be calm and quiet and begin asking your questions…Any type of restraint is to be avoided…because the person having the seizure is not going to be able to

respond to that restraint appropriately...it would have been better for that officer to go out of (Pinkins') field of vision. And if he's going to wander out into that street past the stop lights, gently take him by the shoulders and just turn him in another direction. Because he'll just veer in that new direction. *See Investigative Report and The Video*

31. That the disparity between Officer Diedrich's use of deadly force on Plaintiff and Art Taggart's assessment is of a polar opposite extreme by way of application in dealing with a person experiencing a (diabetic) seizure *See Investigative Report and The Video.*

32. That soon thereafter Racine police backup arrived to assist Officer Diedrich *See Investigative Report and The Video.*

33. That soon thereafter Racine the emergency squad arrived to assist Plaintiff.

**December 14th, 2016 Preliminary Hearing *The State of Wisconsin vs. Pinkins* 2016 CF 1498**

34. That Officer Diedrich was questioned at a preliminary hearing regarding the use of force during the events of October 16th, before a Commissioner, which generated the *Diedrich Transcript*.

35. That if one examines the *Diedrich Transcript* it is a document generated in the Racine County Circuit Court which examines whether Officer Diedrich's use of force was justified. It is generated by officials intimately interwoven with familiarity of the policies and practices of The City of Racine and its police department.

36. Perhaps what is shocking about the *Diedrich Transcript* is that even though Plaintiff was taken to the hospital and treated, nowhere in the transcript do any of the officials actually

37. At the preliminary hearing officials do not cite any policy even vaguely referencing Plaintiff's medical condition, even though that information was available, which even the Commissioner was taken aback by:

Erica Motsch: Assistant District Attorney Racine County at 19

"Additionally, though, he may have been intoxicated or under the influence or not in his right mind but one can still form intent at that point to hit somebody or strike somebody"

**The Court (Racine County Circuit Court) at 19:**
"All Right. Well, at this stage of the proceedings, it's just probable cause. So based on the testimony I've heard, we've heard no testimony at all about the length or the duration or the extensiveness of the medical issue afflicting Mr. Pinkins" (*Diedrich Transcript*)

38. In fact, the preliminary hearing (*Diedrich Transcript*) does not refer to any policy, practice, custom or habit of the City of Racine Police Department had in place to evaluate (diabetic) seizures during a proceeding where events began in a community caretaker context and quickly escalated to Officer Diedrich's use of deadly force on Plaintiff.

39. That the City of Racine Police Department is deliberately indifferent by policy, routine, custom or habit to the assessment of persons experiencing diabetic seizures. *Investigative Report.*

40. That the City of Racine does its Officers a system wide disservice by not implementing a system wide training program to its dedicated individual officers.

41. That diabetes is not an esoteric medical condition with exotic symptoms. More than 100 million U.S. adults are now living with diabetes or pre diabetes, according to the Centers for Disease Control and Prevention (CDC). The report finds that as of 2015, 30.3 million Americans – 9.4 percent of the U.S. population – have diabetes.

42. BY CDC numbers, the chances of another Racine Police Officer encountering another diabetic seizure incident is a virtual certainty, when one in 10 Americans suffer some form of the affliction.

43. Unfortunately, The City of Racine is currently indifferent by a department wide policy or custom or practice of deliberate indifference to (diabetic) seizure training and will get to it, "down the line" *Investigative Report.*

44. That subsequently on October 7th, 2016 Plaintiff was charged with:

    a. Battery to a Law Enforcement Officer;
    b. Attempt to Disarm a Peace Officer;
    c. Resisting or Obstructing an Officer;
    d. Disorderly Conduct
    (that attached hereto as Exhibit 5 is a true and accurate copy of the CCAP entries for 2016 CF 1498)

45. That at all times material to the October 16th 2016 incident the Plaintiff was so completely disorientated by the diabetic seizure so as not to be cognizant or aware of the events that took place, or that were taking place. Put another way, Plaintiff could not have formed the necessary *mens rea* to engage in the crimes he was charged for, nor was Plaintiff criminally reckless as one might be after the consumption of drugs or intoxicants, Plaintiff had an involuntary and acute diabetic seizure.

46. That after a period of approximately seven (7) months of incarceration, The Racine District Attorney dismissed all charges by motion of the State, asserting the Plaintiff's medical condition as the cause of the State's dismissal of the case.

### The Events of October 29th 2017

47. That by October 29th, 2017 The Racine Police may have remembered Plaintiff from the October 16th, 2016 encounter with him, especially since the former incident involved Racine Police Officers encountering Plaintiff in an acute diabetic seizure.

48. Had the City of Racine Police Department actually implemented a system wide training program on dealing with diabetic seizures they would likely have benefitted to know that:

    a. use of conducted energy devices ("taser") on individuals with diabetes is particularly significant because of the potentially adverse effects of such force on the endocrine system, which already is compromised in individuals with diabetes and that National Institute of Justice has commissioned studies on the adverse impact of tasers. See Taser International, *Metabolic Acidosis-Detail* (2008)

49. That on October 29th 2017, and at all material times hereto, Plaintiff was at a homeless shelter in Racine called HALO as a resident and volunteer cook.

50. That while at HALO, Plaintiff was listening to music on his headphones during the overnight hours.

51. That under HALO guidelines it is perfectly lawful to listen to headphones.

52. That at some point a person from HALO named Roberta complained to Plaintiff that the headphones were emanating too much noise, but Plaintiff disagreed and replied that he was lawfully listening to music on his headphones (per the HALO guidelines).

53. That instead of informing a staff supervisor, as HALO guidelines required, Roberta called the Racine Police to report the Plaintiff.

54. That when the Police arrived at HALO, Plaintiff was in the bathroom answering the call of nature, with his headphones on and unaware that the Racine Police were called.

55. That then and there in the wee hours of the morning, the Racine Police barged into the bathroom.

56. That Plaintiff was startled by the Racine Police and was confused as to why the police had entered.

57. After they barged in Racine Police began yelling at the Plaintiff who was somewhat disoriented and soon after the Racine Police deployed a taser on the Plaintiff.

58. That the use of a taser "constitutes an intermediate level of force that must be justified by a strong and compelling government interest *Schreiner v. City of Gresham* 681 F. Supp. 2d 1270; See Also *Bryan v. MacPherson* 630 F 3rd 805, 826 (9th Cir. 2010).

59. That in *Bryan* in the summer of 2005, Officer Brian MacPherson deployed his taser against Carl Bryan during a traffic stop for a seatbelt infraction. Bryan filed an action under 42 U.S.C. § 1983 asserting excessive force in violation of the Fourth Amendment. The Ninth Circuit held:

"we evaluate the government's interest in the use of force by examining three core factors, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." These factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider "whatever specific factors may be appropriate in a particular case, whether or not listed in Graham." This analysis allows us to "determine objectively the amount of force that is necessary in a particular situation. Viewing the facts in the light most favorable to Bryan, the totality of the circumstances here did not justify the deployment of the Taser X26." *Bryan v. MacPherson* 630 F 3rd 805, 826 (9th Cir. 2010).

60. Much like the *Byran* case the Racine Police tasered the Plaintiff over a trivial matter, soon after nature's call, in a confined bathroom for a suspected minor infraction.

61. That thereafter Plaintiff had to receive surgery to remove parts of the taser wire embedded from his back.

62. That Plaintiff was subsequently arrested and charged with four separate offenses:

    a. Disorderly Conduct;
    b. Two Counts of Bail Jumping;
    c. Resisting Arrest;

63. That again on September 25th 2018 the District Attorney moved to voluntarily dismiss all charges against the Defendant on behalf of the State. (that attached hereto as Exhibit 5 is a true and accurate copy of the CCAP entries for 2017 CF 1498).

64. That as a result of the Defendant's actions Plaintiff was harmed.

# COUNT 1
## *Monell Claim vs. City of Racine*
## 4th and 14th Amendment Violation(s) by
## 42 U.S.C. 1983
## Policy of a Failure to Train and Deliberate Indifference

"But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have deliberately indifferent to the need. In that event, the failure to provide proper training may be fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury" City of Canton v. Harris 489 U.S. 378, 387-92

**Admission By Racine Police Spokesperson It Does Not Provide Officers With Seizure Training:**

Public Information Sgt. Adam Malacra said, "But there's always room for improvement,"…"Malacara says Racine police did not find any wrongdoing in this case, **while acknowledging that the department's officers have not had seizure training.** "That's something we could do a better job of training our officers in dealing with, recognizing those situations," Malacara said" (*Investigative Report*)

**Admission By Racine Police Spokesperson It Has No Plans To Provide Officers With Seizure Training:**

Malacara says there are no immediate plans to conduct seizure training because the winter schedule is already set, but says there should be more opportunities "down the line" (*Investigative Report*)

**The American Diabetes Association Offers Free or Inexpensive Seizure Training to Police Departments - Nationwide**

65. That Plaintiff readopts and re alleges Counts 1-64 as though fully set out herein.

66. Attached hereto as Exhibit 4 is a true and accurate copy of the Free DVD from the American Diabetes Association - Offer to Law Enforcement titled, "Treating

Diabetes Emergencies: What Police Officers Need to Know" ("Training Video"), which is 20 minutes in length and also available for free on Youtube.

67. Yet, despite the easy availability of training from the American Diabetes Association to the Racine Police Department, it has no realistic plans to implement it as part of a system wide training of Racine Police Officers *(Investigative Report)*.

68. The City of Racine has a policy of omitting seizure training and is deliberately indifferent to the implementation of system wide training of Racine Police Department Officers as a publicly stated policy *(Investigative Report)*.

69. That The City of Racine's Police Department, by its own admission, is deliberately indifferent when its spokesperson acknowledged that Racine Police Officers have not had seizure training and will not receive such training because "the winter schedule is already set" (Id.).

70. That by its own admission The City of Racine's Police Department is deliberately indifferent when its spokesperson acknowledged maintains that "there are no concrete plans to conduct seizure training because the winter schedule is already set, but says there should be opportunities "down the line" (Id.).

71. That the failure to train its officers by the Racine Police amounts to a custom, pattern or publicly stated policy, which by its own admission, is system wide at the Racine Police Department.

72. That the system wide failure by the City of Racine in training its police officers on properly handling seizures in the field was closely related to the Plaintiff's injuries.

73. That the City of Racine by the Racine Police have caused repeated violations of Plaintiff's 4th and 14th Amendment rights.

74. That even aside from repeated violations by the Racine Police Department of Plaintiff's 4th and 14th Amendment rights, it is a highly predictable consequence that the failure to train Racine Police Officers regarding seizures, will simply invite future violations of other people with diabetes, when 1 in 10 Americans suffer some form of the affliction.

75. Since the Racine Police admitted to the failure to adequately train its officers regarding seizures on Fox 6 News, then they must be believed and as such there is sufficient factual matter to show the feasibility of deliberate indifference.

76. That these admissions by the City of Racine were not some "smoky roomed gottcha moments" posted by an obscure third-party in some crevice of the internet, but instead The City of Racine made these admissions by an official spokesperson to a journalist during a scheduled interview the City of Racine should have known would be made public.

77. That the Plaintiff's injuries and harm were a closely linked cause and consequence of a system wide failure of training by The City of Racine of Racine Police Officers.

78. That the City of Racine has an obvious need to train its police officers how to deal with diabetic seizures, but it has maintained a deliberate indifference to doing so.

79. That as a result of the acts, or omissions by the City of Racine, Plaintiff was harmed.

## COUNT 2
### 4th Amendment Violations, Excessive Force and Freedom From Unreasonable Seizures By 42 U.S.C. 1983 vs. Racine Police Officer Joshua Diedrich

80. That Plaintiff readopts and re alleges Counts 1-79 as though fully set out herein.

81. That at all times material hereto Racine Police Officer Joshua Diedrich ("Diedrich") was acting in his official capacity as a Racine Police Officer.

82. That on October 16th, 2016 Plaintiff was having an epileptic seizure and had no committed no crime, nor was he suspected of having committed a crime.

83. That the seizure of the Plaintiff was executed by means of excessive physical force and show of authority, which restrained the liberty of Plaintiff.

84. That during said seizure, Diedrich punched Plaintiff multiple times, with a closed fist, causing Plaintiff Plaintiff permanent injuries to Plaintiff's eye(s), vision, jaw and dental as well as bodily harm.

85. That Officer Dierich's own sworn testimony states he was responding in a "community caretaker" capacity, a distinction of note under the Three Part *Graham* analysis *Diedrich Trans at 6*.

86. That Diedrich's seizure of the Plaintiff was unreasonable, especially as viewed from a "community caretaker capacity" under Graham v. Conner 490 U.S. 386 at 396:

    a. (1) There was no "severity of the crime at issue", because Diedrich was not responding to a report or suspicion of a crime, but rather to a request for emergency medical assistance.

    Under the first factor in *Graham* Officer Diedrich witnessed visible indicators of what he thought was a seizure when he arrived on the scene. "He was on the ground shaking which I believed to be having a seizure. He had vomit around his face and on his clothing."*Diedrich Transcript* at 5, *See Also Video*.

    b. (2) Whether the suspect poses an immediate threat to the safety of the officers or others.

    Under the second factor in *Graham* Plaintiff was on the ground in the midst of a diabetic seizure and not posing much of a risk to others when Officer Diedrich first arrived. Officer Diedrich escalated the situation and it was after all Officer Diedrich who grabbed, tackled and began repeatedly punching a disoriented Plaintiff that any threat began to escalate *See Video*.

    (Retired) Epilepsy Foundation Heart of Wisconsin Executive Director, Art Taggart said after watching the dashcam video:"Immediately the policeman recognized that it was probably a seizure happening…an appropriate response is not to escalate the situation, to be calm and quiet and begin asking your questions…Any type of restraint is to be avoided…because the person having the seizure is not going to be able to respond to that restraint appropriately…it would have been better for that officer to go out of (Pinkins') field of vision. And if he's going to wander out into that street past the stop lights, gently take him by the shoulders and just turn him in another direction. Because he'll just veer in that new direction. *Investigative Report*

15
Case 2:19-cv-00368-PP   Filed 03/12/19   Page 15 of 20   Document 1

c. (3) whether he (or she) is actively resisting arrest or attempting to evade arrest by flight

Under the third factor in *Graham*, Officer Diedrich was not dealing with an "arrest" when he arrived, but was there by his own admission in a caretaker capacity. In fact Plaintiff could not have formed the necessary *mens rea* to resist an arrest. Officer Diedrich was the one who escalated the situation to the use of deadly force *See Video*.

"That person is not aware of who you are, or what your purpose is, or that you're a police officer" *Art Taggart Investigative Report*

87. That given Officer Diedrich's own admission that he was not acting in the role of an arresting officer but in that of a community caretaker and as such Plaintiff's burden of clearing the three part test under *Graham* should be lower than in a criminal context.

88. That as a result of Officer Diedrich's actions or inactions, the Plaintiff suffered harm.

## COUNT 3
## 4th Amendment Violations of Excessive Force and Freedom From Unreasonable Seizures
## 42 U.S.C. 1983 vs.
## Racine Police Officers 1-5

89. That Plaintiff readopts and re alleges Counts 1-88 as though fully set out herein.

90. That when Racine Police Officers 1-5 tasered Plaintiff in a confined bathroom they used an unjustified intermediate level of force without justification or without a compelling government interest.

91. That Diedrich's seizure of the Plaintiff was unreasonable under Graham v. Conner 490 U.S. 386 at 396:

   a. (1) There was little if any "severity of the crime at issue", because Racine Police Officers were not responding to anything more serious than a man in bathroom with headphones on.

b. (2) Whether the suspect poses an immediate threat to the safety of the officers or others. Here, Plaintiff posed no threat to anyone in a bathroom listening to his headphones. Perhaps the Racine Police were already apprehensive of Plaintiff from an earlier encounter on October 16th 2016, however a system wide failure of training does not constitute an excuse.

c. (3) whether he (or she) is actively resisting arrest or attempting to evade arrest by flight. Here the Plaintiff could not have escaped from Racine Police Officers in the narrow confines of a bathroom. Even if the Plaintiff was initially startled by the officers confronting him immediately after nature's call, the Officers have a heightened duty to explain why they needed to use a taser on the Plaintiff.

92. That the State again dismissed all charges against the Defendant.

93. That as a result of Police Officers 1-5 actions or inactions the Plaintiff was harmed.

## COUNT 4
## Injunctive Relief Under
## 42 U.S.C. 12101
## The Americans With Disabilities Act

The remedies for violations of Title II and Title III of the ADA are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964., 42 U.S.C. § 2000d et seq. Barnes v. Gorman, 536 U.S. 181, 185, 122 S. Ct. 2097, 2100, 153 L.Ed. 2d 230 (2002).

Declaratory and injunctive relief are proper remedies and have been granted in many such cases. See, e.g., Radaszewski ex rel. Radaszewski v. Maram, 383 F.3d 599, 606 (7th Cir. 2004); Flynn v. Doyle, 672 F. Supp. 2d 858, 880 (E.D. Wis. 2009);

Because the Defendant's discriminatory conduct presented and still presents a real and immediate threat of current and continuing future violations, declaratory and injunction relief are appropriate remedies.

94. That Plaintiff readopts and re alleges Counts 1-93 as though fully set out herein.

95. That diabetes is not an esoteric medical condition with exotic symptoms. More than 100 million U.S. adults are now living with diabetes or prediabetes,

according to the Centers for Disease Control and Prevention (CDC). The report finds that as of 2015, 30.3 million Americans – 9.4 percent of the U.S. population – have diabetes.

96. BY CDC numbers, the chances of another Racine Police Officer encountering another diabetic seizure incident is a virtual certainty, when one in 10 Americans suffer some form of the affliction.

97. That similar to actions brought under 42 U.S.C. 1983, there is no requirement that the Plaintiff file a state or municipal notice of claim before filing for injunctive relief under Title II of the ADA, due to federal supremacy.

98. More than 100 million U.S. adults are now living with diabetes or prediabetes, according to the Centers for Disease Control and Prevention (CDC). The report finds that as of 2015, 30.3 million Americans – 9.4 percent of the U.S. population – have diabetes.

99. That given the prevalence of persons with diabetes it is a virtual certainty that another diabetic seizure incident will happen in the City of Racine and that as things stand now, The City of Racine Police Department Officers will not be properly trained in how to respond.

100. That proper seizure response training is available for free or at a negligible price from the American Diabetes Association.

### Prayers For Relief

**Wherefore,** Plaintiff demands judgment against Defendants for the harm set out above as follows: City of Racine, Officer Joshua Diedrich in his official and personal capacity and against Racine Police Officers 1-5 in their official and personal capacities as follows:

101. <u>Defendant City of Racine</u>:

   a. Under 42 U.S.C. 1983 - That the City of Racine had a policy, practice, custom or habit by the City of Racine Police Department to not train and/or or a failure to train Racine Police Officers to evaluate diabetic seizures, which caused violations of the Plaintiff's constitutionally

protected rights under the 4th and 14th Amendments of the Constitutions and under Title II of the Americans with Disabilities Act;

b. Under 42 U.S.C. 1983 - For actual, foreseeable, consequential, punitive and mental anguish against the City of Racine, for said policy, practice, custom or habit and/or failure to train which caused Plaintiff personal injury with permanency as a result of excessive and deadly force used by Officer Diedrich;

c. Specifically for special damages under Rule 9(g), in the form of punitive damages;

d. Under the Americans with Disabilities Act - For a permanent injunction which enjoins Defendant City of Racine policy, practice, custom or habit by the City of Racine Police Department to not train and/or or a failure to train Racine Police Officers to evaluate diabetic seizures and requiring department wide training.

e. For attorney's fees under 42 U.S.C. 1988 and under the ADA 42 U.S.C. 2000a3(b);

102. <u>Defendant Racine Police Officer Joshua Diedrich</u>:

a. Under 42 U.S.C. 1983 for depravation of Plaintiff's constitutional rights under the 4th and 14th Amendments and under Title II of the Americans with Disabilities Act for excessive force, unjustifiable deadly force;

b. Under 42 U.S.C. 1983 for said constitutional violations by Officer Diedrich which caused Plaintiff actual, foreseeable, consequential, punitive and mental anguish ad for personal injury with permanency damages as a result of excessive and deadly force used by Officer Diedrich;

c. Specifically for special damages under Rule 9(g), in the form of punitive damages;

d. For attorney's fees under 42 U.S.C. 1988;

103. <u>Defendant Racine Police Officers 1-5</u>:

a. Under 42 U.S.C. 1983 for deprivation of Plaintiff's constitutional rights under the 4th and 14th Amendments and under Title II of the Americans with Disabilities Act for excessive force, unjustifiable deadly force;

b. Under 42 U.S.C. 1983 for said constitutional violations by Racine Police Officers 1-5 which caused Plaintiff actual, foreseeable, consequential, punitive and mental anguish ad for personal injury with permanency damages as a result of excessive and deadly force used by Racine Police Officers 1-5

c. For attorney's fees under 42 U.S.C. 1988;

Dated this 11th of March 2019

Attorneys for Plaintiff,

_____
Paul Strouse- *Attorney At Law*
SBN: 1017891
Thomas Napierala- *Attorney at Law*
SBN: 1011811

Prepared By:

The Law Offices of Paul Strouse
413 North 2nd Street Suite #150
Milwaukee WI 53203

The Law Offices of Thomas Napierala
413 North 2nd Street Suite #150
Milwaukee WI 53203