UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TYRAN PINKINS,

        Plaintiff,

    v.                                   Case No. 19-cv-0368-bhl

CITY OF RACINE, et al.,

        Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT

      In this chimera of a lawsuit, Plaintiff Tyran Pinkins complains about three different brushes with County and City of Racine officials that took place over the course of a calendar year. Based on these separate encounters, Pinkins brings a litany of claims against the County, City, and their respective agents. Both the County and City Defendants have moved for summary judgment. Because the summary judgment record would not permit a reasonable jury to find any of the County Defendants liable, their motion will be granted. The record leaves questions of fact with respect to some of Plaintiff's claims against the City Defendants, however, so their motion will be granted only in part.

## FACTUAL BACKGROUND

      On October 6, 2016, at approximately 6:32 p.m., City of Racine Police Department Officer Joshua Diedrich was driving his patrol car along Main Street when a civilian flagged him down and directed him to the intersection of Lake Avenue and State Street. (ECF No. 128-1 at 18.) There, he found one man (Zachary Fisher) standing over another (Plaintiff Tyran Pinkins), who was prostrate and apparently covered in vomit. (*Id.*) Based on Fisher's word and his own observations, Diedrich believed Pinkins may have suffered an epileptic seizure, so he radioed for medical assistance. (ECF Nos. 128-1 at 24 & 165 at 3.) After a few moments, Pinkins gathered his belongings and stood up, but he did not respond to any of Officer Diedrich's questions. (ECF No. 128-1 at 24.) Dashcam video of the incident shows that Diedrich asked Pinkins to sit down and wait for the EMTs, but Pinkins instead trudged toward the crosswalk. (*Id.* at 24-25; *see also*

ECF No. 137.) Diedrich then placed his hands on Pinkins and steered him away from the road. (ECF No. 128-1 at 25.) Pinkins circled around a lamppost at the sidewalk's edge, and Diedrich maintained his grasp on Pinkins' shoulders. (*Id.*) At this point, Diedrich either threw Pinkins to the ground, away from the street, or Pinkins fought loose and fell to the ground on his own. (ECF No. 137 at 2:15.) Pinkins then clambered to his feet and darted southbound. (ECF No. 128-1 at 27.) Officer Diedrich gave chase. (*Id.*) Some kind of struggle ensued (outside of the dashboard camera's field of vision) after which Diedrich ended up atop Pinkins and began raining strikes upon Pinkins' face and upper chest. (*Id.* at 28-30.) Shortly thereafter, a civilian witness joined the fray and helped Officer Diedrich subdue Pinkins. (*Id.* at 30.) Backup arrived, and Pinkins was taken into custody. (*Id.* at 31.)

Following his arrest, Pinkins was booked into the Racine County Jail. (ECF No. 126-1 at 11.) Contemporaneous medical evaluations revealed that he had sustained facial lacerations, swelling, and a conjunctival hemorrhage in his right eye. (ECF No. 126-6 at 4.) Pinkins underwent routine intake medical screening the next day and met with both medical and mental health staff the day after that. (ECF No. 126-1 at 12.) On October 9, 2016, Pinkins completed a request for additional medical attention. (*Id.*) Deputy Sheriff Andrew Ellenberger received this request and forwarded it to Advanced Correction Healthcare, Inc.—the medical provider at the jail. (*Id.* at 12-13.) On October 11, ACH staff evaluated Pinkins again, consistent with his filed request. (*Id.* at 12.) Over the next several months, Pinkins filled out repeated requests for medical services and generally received prompt care in response. (*Id.* at 26.) One such request occurred on February 4, 2017. (*Id.* at 21.) Deputy Sheriff Geoffrey Thompson received this request, and directed it to ACH staff, who provided Pinkins treatment on February 6, 2017. (*Id.*) In total, Pinkins filed about 60 requests for medical treatment during his time at Racine County Jail, and he received medical treatment 85 times over the course of his approximately 200-day incarceration. (*Id.* at 26.) He was released on June 3, 2017. (*Id.*)

Almost five months after he was released from jail, Pinkins had another run-in with the Racine police. On October 29, 2017 at 3:08 a.m., City of Racine Police Officers Todd Lauer and Jacob Mauer were dispatched to the Homeless Assistance Leadership Organization (HALO) to remove Pinkins, who had been staying at the facility, but was refusing to comply with HALO's curfew rules. (ECF No. 128-1 at 46.) The night manager informed Officer Lauer that Pinkins had locked himself in a bathroom stall where he was listening to music on his phone. (*Id.* at 48.)

Officer Lauer told Pinkins that he needed to leave the HALO facility because he was creating a disturbance. (*Id.* at 49.) Pinkins initially refused. (*Id.*) At some point, Pinkins exited the stall. (*Id.*) He ended up on the bathroom floor, either because the officers wrestled him there or because he chose to lay down instead of leaving. (*Id.* at 50.) He maintained an unwillingness to leave the HALO facility. (*Id.*) In response, Officer Lauer deployed his taser for a single five-second cycle. (*Id.* at 51.) Pinkins was then handcuffed and removed from the facility. (*Id.*)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

Pinkins' three-headed complaint asserts claims against two groups of defendants, the County of Racine and several County employees, and the City of Racine along with several City employees. These claims arise from a trio of incidents: (1) Officer Diedrich's October 6, 2016 encounter with Pinkins; (2) Pinkins' incarceration in Racine County Jail from October 2016 through April 2017; and (3) Officer Lauer's October 29, 2017 encounter with Pinkins.

With respect to the first incident, the encounter with Officer Diedrich, Pinkins asserts an excessive force claim against Diedrich (Count II), along with *Monell*, ADA, and false imprisonment claims against the City of Racine (Counts I, V, and VII). Based on his incarceration in the Racine County Jail, Pinkins asserts a Fourteenth Amendment claim for the alleged objectively unreasonable denial of medical treatment against County Sheriffs Ellenberger and Thompson (Count IV), and *Monell*, ADA, and false imprisonment claims against Racine County (Counts III, V, and VII). Last, Pinkins asserts an excessive force claim against City Police Officer Lauer based on the October 29, 2017 incident at the homeless shelter (Count VI).

The County and City Defendants each filed separate motions for summary judgment. Because no rational factfinder could conclude that any of the County Defendants are liable on any

count, their motion for summary judgment will be granted in full. The record also precludes liability for the City of Racine itself, but because disputes of fact exist with respect to the excessive force claims against Diedrich and Lauer, those claims must be allowed to proceed to trial. The Court will, therefore, grant in part and deny in part the City Defendants' motion for summary judgment.

I. **Pinkins' Excessive Force Claim Against Officer Diedrich Survives Summary Judgment, But His Other Claims Arising from the October 6, 2016 Incident Fail as a Matter of Law.**

Based upon his October 6, 2016 encounter with Officer Diedrich, Pinkins alleges a claim for excessive force against Diedrich himself, as well as claims against Diedrich's employer (the City of Racine) for false imprisonment and violations of *Monell* and the ADA. Because the summary judgment record only supports the excessive force claim against Diedrich, Defendants' motion will be granted as to all other claims relating to the events of October 6, 2016.

A. **Disputes of Fact Preclude Summary Judgment in Favor of Officer Diedrich.**

Pinkins alleges that Officer Diedrich used excessive force to seize and detain him on October 6, 2016. Diedrich argues that his conduct was reasonable under the circumstances, and, in any case, he is protected by Wisconsin's community caretaker doctrine and the doctrine of qualified immunity.

The community caretaker doctrine recognizes that law enforcement officers are often asked to discharge caretaking functions unrelated to the enforcement of criminal statutes. *Caniglia v. Strom*, 141 S. Ct. 1596, 1598 (2021). Consider the difference between an officer who pulls a vehicle over after watching it swerve between lanes and an officer who stops behind a vehicle parked on the highway shoulder to see if the occupants need assistance. In the latter case, the officer is performing a caretaking function and, depending upon the circumstances, may be permitted to seize the individuals he encounters without reasonable suspicion, notwithstanding the Fourth Amendment. *Id.* In Wisconsin, "'when a community caretaker function is asserted as justification for the seizure of a person, the trial court must determine: (1) that a seizure within the meaning of the [F]ourth [A]mendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3) if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual.'" *State v. Kramer*, 759 N.W.2d 598, 605 (Wis. 2009) (quoting *State v. Anderson*, 417 N.W.2d 411, 414 (Wis. Ct. App. 1987)).

The issue in this case is not whether *any* of Officer Diedrich's actions constituted community caretaking. Some unquestionably did. For example, he should be commended, not condemned, for steering Pinkins away from the crosswalk and attempting to provide him with medical services. That he placed his hands on Pinkins' shoulders to accomplish these socially beneficial ends is immaterial. The Constitution does not treat an officer's decision to prevent a disoriented person from wandering into traffic as an "unreasonable" seizure under the Fourth Amendment. *See State v. Blatterman*, 864 N.W.2d 26, 42 (Wis. 2015) (permitting police to exercise force when transporting a suicidal man to a hospital). But a police officer cannot simply dub himself a "community caretaker" and disclaim all liability for his actions. To beat a civilian bloody in the name of *community caretaking* stretches that concept to its snapping point. Community caretaking is "'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Kramer*, 759 N.W.2d at 606 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Accordingly, once Diedrich decided to detain Pinkins for disorderly conduct and resisting arrest, he was no longer a community caretaker; he was a genuine law enforcement officer with all the authority and exposure to liability that the position entails. *See In re Kelsey C.R.*, 626 N.W.2d 777 (Wis. 2001) (police exercised community caretaking functions when they seized a girl they thought might be a runaway, but when she fled, her subsequent apprehension and investigative detention were evaluated under the Fourth Amendment). In short, the community caretaker doctrine precludes liability for any action Diedrich took prior to Pinkins' escape, but it does not shield him from liability for what may have occurred off-screen or during their scuffle. If Diedrich used excessive force in that context, his initial role as a community caretaker does not immunize him from potential liability.

Diedrich argues that, even if his community caretaking role is not a defense, this situation calls for qualified immunity. Police officers are entitled to qualified immunity and are protected "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A claim that a police officer has used excessive force in the course of a seizure is analyzed under the Fourth Amendment. *Lester v. Chicago*, 830 F.2d 706, 712 (7th Cir. 1987). The quantum of force used should be measured against "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v.*

*Connor*, 490 U.S. 386, 396 (1989). An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of arrest, the officer used greater force than was reasonably necessary to effectuate the arrest. *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). The use of such force establishes a constitutional violation, and if the right violated was clearly established at the time of the officer's actions, then qualified immunity does not attach.

The issue here is that qualified immunity turns on disputed events that occurred off-camera. Diedrich had reasonable suspicion to investigate Pinkins. *See State v. Anderson*, 454 N.W.2d 763, 766 (1990) ("flight at the sight of a police officer certainly gives rise to a reasonable suspicion that all is not well"). And he was permitted to use reasonable force to do so. *See State v. Goyer*, 460 N.W.2d 424, 426 (Wis. Ct. App. 1990) ("The right to make a *Terry* stop would mean little if the officer could not restrain a suspect who attempts to walk away from the investigation."). He claims that the force employed was proportionate to the resistance Pinkins put up. (*See* ECF No. 97 at 18) (stating that Pinkins kicked and punched Diedrich off-camera). Pinkins tells a different story. (*See* ECF No. 165 at 44) ("Pinkins disputes that he ever punched or kicked Officer Diedrich at all"). If one view of the disputed facts could lead a jury to conclude that an officer violated a clearly established constitutional right, the officer may not seek qualified immunity based on an alternative, more advantageous, reading of those facts. *See Nettles-Bey v. Williams*, 819 F.3d 959, 961 (7th Cir. 2016) (holding that where the admissible evidence would permit two inferences, one of which would implicate violations of a plaintiff's clearly established constitutional rights, the case must proceed to trial, and the officers are not entitled to qualified immunity). In this case, the jury could believe either that Pinkins assaulted Diedrich off-camera or that Diedrich began wailing on Pinkins unprovoked. If it accepts the second of these inferences, a reasonable jury could find the force employed was excessive and violative of a clearly established constitutional right. *See Gonzalez*, 578 F.3d at 539. Therefore, qualified immunity does not apply. This claim must proceed to trial.

**B.    The Undisputed Record Would Not Permit a Reasonable Jury to Find in Pinkins' Favor on His *Monell* Failure to Train Claim.**

Pinkins argues that the City of Racine's failure to teach employees how to properly interact with individuals experiencing seizures deprived him of his constitutional rights. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To succeed, a plaintiff must ordinarily show a "pattern of similar constitutional violations by untrained employees." *Id.* at 62. The rare

exception occurs where a pattern would be unnecessary because the need to train is patently obvious. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) (noting that a municipality would be liable for failure to train, upon the first violation of rights, under *Monell* for releasing armed officers into the public for the purpose of capturing fleeing felons without teaching those officers the constitutional limits on the use of deadly force).

Pinkins has pinpointed only a single instance in which a City of Racine police officer used force to subdue an individual (possibly) experiencing a seizure: his own interaction with Officer Diedrich. This one example is insufficient to establish a pattern, and it does not reflect the risk of highly predictable consequences delineated in the Supreme Court's *Canton* example. As a result, the City of Racine is entitled to summary judgment on this *Monell* claim.

### C. The Undisputed Record Shows that the City of Racine Did Not Violate the Americans with Disabilities Act.

As with his ADA claim against the County of Racine, Pinkins seeks injunctive relief against the City of Racine. He requests a permanent injunction, which would require the City of Racine to train police officers on how to properly interact with individuals experiencing epileptic seizures. But once again, Pinkins has failed to establish any Title II violations that entitle him to relief, injunctive or otherwise. To prevail on his claim, Pinkins "must prove . . . that a [Racine] 'official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on [Racine's] behalf ha[d] actual knowledge of discrimination in [Racine's] programs and failed to adequately respond.'" *Ravenna v. Village of Skokie*, 388 F. Supp. 3d 999, 1008 (N.D. Ill. 2019) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

In *Ravenna*, the court held that a reasonable jury could hold the municipality directly liable for the ADA violations of its officers because the local police department had extensive experience with the plaintiff prior to the incident at issue, and there was evidence that the department regarded her as having a disability. *Ravenna*, 388 F. Supp. 3d at 1008-09. By contrast, Pinkins has not established the City of Racine Police Department's familiarity with him, nor has he offered any evidence to suggest that the department regards him as an individual with a disability. Diedrich may have thought Pinkins an individual with a disability during their encounter, but that lone instance is insufficient to impute knowledge of alleged discrimination to a policymaking official. Accordingly, the City of Racine is also entitled to summary judgment on this claim.

### D.     The City of Racine Is Immune from Suits for False Imprisonment.

Pinkins' final claim against the City attempts to hold it liable for his supposedly false imprisonment in the Racine County Jail, which he asserts would never have occurred but for the actions of Officer Diedrich.  In Wisconsin, false imprisonment is an intentional tort.  *See Nelson v. City of Milwaukee*, 203 N.W.2d 684, 686 (Wis. 1973).  And Wis. Stat. Section 893.80(4) immunizes cities from liability for the intentional torts of their agents and employees.  *See* Wis. Stat. §893.80(4); *Strong v. City of Milwaukee*, 157 N.W.2d 619, 622 (Wis. 1968).  Thus, Pinkins cannot invoke respondeat superior to hold the City of Racine accountable for Officer Diedrich's actions, and this claim must be dismissed.

## II.     Pinkins Has Not Identified Facts Sufficient to Maintain His Claims Based on His Time in the Racine County Jail.

Pinkins' second set of claims arise from the time he spent incarcerated at the Racine County Jail.  He alleges that during this period Sheriffs Ellenberger and Thompson violated his constitutional right to due process, and the County of Racine falsely imprisoned him and violated *Monell* and the ADA.  On the record as it stands, no reasonable factfinder could rule in Pinkins' favor, so these claims will be dismissed.

### A.     There Is No Dispute that Sheriffs Ellenberger and Thompson Provided Pinkins with Constitutionally Sufficient Medical Care.

Pinkins alleges that, while locked up in Racine County Jail, he did not receive medical treatment commensurate with his constitutional right to due process.  In particular, he asserts that Sheriffs Ellenberger and Thompson delayed treatment in urgent situations, resulting in worsening injuries and prolonged, unnecessary suffering.

Pinkins was a pre-trial detainee, so his claims are evaluated under the Fourteenth Amendment.  *See Miranda v. County of Lake*, 900 F.3d 335, 350-52 (7th Cir. 2018).  To prevail, he must show that he suffered from an objectively serious medical condition and Defendants' response to that medical condition was objectively unreasonable.  *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019).  A medical condition is sufficiently serious if a physician has diagnosed it as one mandating treatment or if it is so obvious that even a layperson would perceive the need for a doctor's attention.  *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).  If the condition does not fall into either of those two categories, a non-medical prison official generally meets his constitutional burden when he brings the inmate's alleged ailments to the attention of medical professionals who are qualified and empowered to prescribe a course of treatment.  *Greeno v. Daley*, 414 F.3d 645,

656 (7th Cir. 2005). And where non-medical prison officials delay, rather than outright deny, treatment, a plaintiff cannot succeed on his claim unless he proffers medical evidence verifying a causal connection between the delay and some degree of harm. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013).

As to Sheriff Ellenberger, Pinkins alleges that a failure to procure punctual medical treatment resulted in a conjunctival hemorrhage, the physical manifestation of a Fourteenth Amendment due process violation. Ellenberger received Pinkins' request to have his injured right eye examined on October 9, 2016, and forwarded it to ACH medical staff, who provided the requested treatment two days later. (ECF No. 126-1 at 12.) ACH staff noted the existence of the aforementioned conjunctival hemorrhage at this October 11 checkup. But the record confirms that Pinkins' hemorrhage was already present on October 6 when he was booked into the Jail. (ECF No. 126-6 at 4.) And Pinkins proffers no evidence to suggest that it worsened during the two-day wait between treatment request and receipt. This makes sense because, despite the inauspicious-sounding diagnosis, a conjunctival or subconjunctival hemorrhage is just a multisyllabic way to describe a broken blood vessel in the eye. *Subconjunctival hemorrhage (broken blood vessel in eye)*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/subconjunctival-hemorrhage/symptoms-causes/syc-20353826 (last visited March 29, 2022). It is a relatively harmless injury that requires no treatment and can result from something as simple as a strong sneeze. *Id.* Under Seventh Circuit law, breathing problems, chest pains, dizziness, sinus issues, headaches, and a loss of energy are considered objectively minor conditions for which no immediate medical treatment is required. *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999). It would be a major departure from that precedent to conclude that constitutional compliance turns on the effective velocity of a sneeze.

But notwithstanding the severity of his eye injury, Pinkins maintains that he suffered needless pain for two days while awaiting treatment. Unnecessarily delaying treatment that prolongs pain for even a day and a half can violate an inmate's constitutional rights in certain circumstances. *See Smith v. Knox County Jail*, 666 F.3d 1037, 1040 (7th Cir. 2011). But to the extent Pinkins suffered during his wait, he did so voluntarily. He actively refused pain medication at every turn. (ECF No. 93 at 20.) Thus, it was not Ellenberger who prolonged Pinkins' pain, but Pinkins himself. An inmate cannot knowingly elect prolonged suffering and then sue those who

offered to mitigate it. The undisputed facts show neither an objectively serious injury nor an objectively unreasonable response, so Ellenberger is entitled to summary judgment.

Pinkins' case against Sheriff Thompson is even weaker. Like Ellenberger, Thompson received a medical request from Pinkins, this time based on allegedly severe stomach pain. (ECF No. 126-1 at 21.) Thompson transmitted the request to ACH staff, and Pinkins was treated two days later. (*Id.*) As an initial matter, Pinkins did not allege constitutional violations related to stomach pain in his second amended complaint. (ECF No. 141 at 11; *see generally* ECF No. 49.) This alone is fatal to his claim. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"). The claim fares no better on the merits, though. Nothing in the record suggests Pinkins' stomach pain necessitated immediate medical treatment. Indeed, none was required when ACH staff checked on him on February 6. Therefore, Thompson acted reasonably when he forwarded Pinkins' request to medical professionals and relied on their expertise to determine the urgency of treatment. *See Greeno*, 414 F.3d at 656. No rational trier of fact could conclude otherwise. Thus, as with Ellenberger, the claim against Thompson fails.

**B.    Because Neither Sheriff Violated Pinkins' Constitutional Rights, the *Monell* Claim Against Racine County Cannot Stand.**

Pinkins seeks to hold the County of Racine liable for its allegedly unconstitutional policy of denying inmates prompt medical care pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). But "[i]t is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of . . . constitutional rights." *King ex rel. King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007). Ellenberger and Thompson—the County agents who effectuated the complained of policy—did not violate any of Pinkins' constitutional rights. Therefore, *Monell* liability cannot attach, and the County is entitled to summary judgment.

**C.    The Undisputed Record Shows that Racine County Did Not Violate the Americans with Disabilities Act.**

Pinkins requests injunctive relief under the Americans with Disabilities Act, specifically asking the Court to require County of Racine sheriffs undergo seizure and diabetes education and training programs. Assuming a defendant has violated the ADA, injunctive relief may be a proper remedy. *See Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 606 (7th Cir. 2004). But Pinkins has failed to identify any underlying ADA violations. Title II of the ADA forbids

discrimination against persons in correctional facilities. *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998). To prove a Title II violation, a plaintiff must show: "[1] that he is a 'qualified individual with a disability,' [2] that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and [3] that the denial or discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. §12132).

At the outset, it is debatable whether Pinkins is a qualified individual with a disability. He relies on an undiagnosed seizure disorder, but it is undisputed that shortly after his encounter with Officer Diedrich, he told Ascension Hospital medical staff that he had "never had a seizure in the past." (ECF No. 126-6 at 2.) But even if he had a bona fide seizure disorder, his ADA claim would fail because he cannot show that he was denied the benefits of a service of a public entity, let alone that such denial was by reason of his disability. He received treatment 85 times in a 200-day period. (ECF No. 126-1 at 26.) "He may not have received exactly the type of service he wanted when he thought he should have or as often as he thought he should have, but that fact alone does not constitute denial of services." *Brandon v. Smith*, No. 06-1316, 2010 WL 11643322, at *27 (C.D. Ill. Aug. 18, 2010). Given the sheer numerosity of medical checkups he received, no jury could reasonably conclude that Racine County denied Pinkins treatment. Accordingly, the County is entitled to summary judgment on this claim.

### D. Pinkins Improperly Brought False Imprisonment Claims Against Racine County for the Actions of District Attorneys.

Pinkins also seeks to hold Racine County liable for false imprisonment. He alleges that he would not have been detained at Racine County Jail but for the failure of an assistant district attorney to advise a Racine County Circuit Court that his behavior on October 6, 2016 was attributable to a seizure disorder. But since January 1, 1990, all Wisconsin district attorneys have been considered employees of the state, not the county they operate in. *Association of State Prosecutors v. Milwaukee Cnty.*, 544 N.W.2d 888 (Wis. 1996). Racine County cannot be liable under a respondeat superior theory for the actions of state employees. *See Whitaker v. Milwaukee Cnty., Wisconsin*, 772 F.3d 802, 813 (7th Cir. 2014). Thus, this claim also fails.

## III. Pinkins' Excessive Force Claims Against Officer Lauer Survive Summary Judgment.

As to the third encounter in this triumvirate, Pinkins alleges only that Officer Lauer used excessive force to seize and remove him from the HALO facility on October 29, 2017. In response, Lauer asserts that he justifiably deployed his taser to subdue Pinkins.

The Seventh Circuit has held that "an officer's single use of a taser to subdue a suspect, who repeatedly had refused lawful orders of the police, was a 'reasonably proportionate' response where failing to use the taser could have resulted in an escalation of violence." *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011) (citing *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004)). Similarly, multiple uses of a taser are permissible when the first fails to alter a suspect's combative demeanor. *Dockery v. Blackburn*, 911 F.3d 458, 468 (7th Cir. 2018). However, a jury can find taser deployment excessive where a suspect is already subdued. *Id.*

Akin to the claim against Diedrich, disputes of fact preclude summary judgment in Lauer's favor. Lauer testified that he deployed his taser as a last resort, after wrestling Pinkins to the ground where the latter continued to resist. (ECF No. 128-1 at 50.) Pinkins told his therapist that he simply laid down on the bathroom floor instead of leaving when asked. (*Id.*) Lauer correctly notes that refusing to move or employing dead weight tactics in response to an officer's command is a form of resistance. *Padula v. Leimbach*, 656 F.3d 595, 603-04 (7th Cir. 2011). But not every form of resistance warrants 50,000 volts. The question is whether the force employed was reasonable under the circumstances. *See Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). A rational factfinder could certainly credit Lauer's account, and in that case, his actions would appear reasonable enough. However, the same factfinder could also believe Pinkins.

For this reason, Lauer is also not entitled to qualified immunity. On Pinkins' version of events, Lauer did something like administer electricity to a man lying still as the Buddha on a bathroom floor. That would hardly be reasonable under established Seventh Circuit law. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) (noting that it is well-established that officers may not use significant force on passively resisting suspects). Thus, under *Nettles-Bey*, Lauer is not entitled to qualified immunity, and it is for the jury to determine which version of events occurred and any corresponding liability.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the County Defendants' motion for summary judgment under Fed. R. Civ. P. 56 (ECF No. 91) is **GRANTED**, and the claims against those Defendants are dismissed.

**IT IS FURTHER ORDERED** that the City Defendants' motion for summary judgment under Fed. R. Civ. P. 56 (ECF No. 96) is **GRANTED** in part and **DENIED** in part. The motion

is granted with respect to Counts I, V, and VII, and those claims are dismissed.  The motion is denied with respect to Counts II and VI.

Dated at Milwaukee, Wisconsin on March 30, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge